SARA MILLICENT WAGNER,
Plaintiff,

*vs.*

TIDEWATER OIL COMPANY, a corporation of the State of Delaware,
Defendant.

*New Castle, May 24, 1963.*

*Donald W. Booker,* of Coxe, Booker, Walls & Cobin, Wilmington, for plaintiff.

*Henry M. Canby* and *Richard J. Abrams,* of Richards, Layton & Finger, Wilmington, for defendant.

SEITZ, Chancellor: Plaintiff, an upper riparian owner, brings this action to compel the removal from a stream of an obstruction

which allegedly is indirectly causing an inundation of about eight acres of her land. Plaintiff also seeks compensatory damages.

Red Lion Creek flows in a generally easterly direction across the State of Delaware and empties into the Delaware River. Plaintiff's land, consisting of some 62 acres, lies on the north side of the Creek and borders in part on the easterly side of the DuPont Highway, which crosses over the Creek. Tidewater Oil Company ("Tidewater" or "defendant") presently owns all the land on the southerly side of Red Lion Creek from the DuPont Highway eastward to the Delaware River. It also owns all the land similarly situated on the north side of the Creek, except for the parcel owned by plaintiff.

Prior to approximately 1939, Red Lion Creek was a tidal action stream, with tidal inundation as far upstream as plaintiff's property. A tidal dike or embankment, with a sluice gate to control the level of the Creek, was subsequently constructed by public authorities along the Delaware River at the mouth of Red Lion Creek. The original dike was breached in several places during the hurricane season of 1953-54 and was replaced in the fall of 1954 by a new dike with a series of three sluice gates. The sluices consist of three horizontal tubes embedded side by side in the dike which carry the waters of the Creek into the River. On the River side of the tubes are three gates or hatches which are hinged to the tubes at the top. When the River is at high tide, the pressure of the water on the River side of the gates closes the sluices, and the Creek backs up behind the dike. At low tide the gates are uncovered on the River side and the accumulated water from the Creek flows through the tubes into the River. Both before and after the installation of the present sluice gates in 1954, the equipment used to control the effect of the tides on Red Lion Creek has at various times been out of order thus permitting a tidal inundation of the eight acres of plaintiff's land involved in this controversy.

The defendant constructed a large oil refinery on the lands which it had purchased on the south side of Red Lion Creek. As part of the project a number of earthen restraining dikes were built near the Delaware River behind which the defendant dumped material which it had dredged from the bottom of the River for purposes of developing

a ship channel into its refinery. One of the dikes constructed to contain such materials paralleled the then course of Red Lion Creek on its south bank eastward from a point approximately one-half way between the River Road Bridge (lying downstream from plaintiff's property) and the sluice gates at the Delaware River, a distance of about one-quarter of a mile. This restraining dike was built in the latter part of 1956, bordering on the Creek, and dredged material was subsequently pumped behind it.

On December 10, 1957, plaintiff's father sent a letter to Tidewater claiming that the waters of the Creek had been impounded and that portions of the Wagner land were under water. He placed the blame for such condition on the actions of Tidewater resulting from the construction of its dike and asked that Tidewater undertake to remedy the situation by restoring the water on the land to its ordinary channel. Tidewater investigated but took no action in response to this request. Plaintiff, the successor in interest to her father who is now deceased, filed this action on April 25, 1958. For reasons not disclosed to the court, the action did not come to trial until December 1962. This is the decision after final hearing.

What are the facts? First, I find that the bottom of that part of the original channel which ran just to the north of Tidewater's restraining dike was uplifted so that the stream was forced to seek and thereafter follow a new course in flowing toward the River dike. As a consequence, this portion of the main channel of the Creek now lies a considerable distance to the north of the original channel. The waters of the Creek hit the River dike at a point approximately 1000 feet to the north of the sluice gates and are forced to make a right angle turn to the south at that point in order to reach the openings of the gates on the Creek side of the River dike.

Next, I find that the diversion of the channel northward resulted gradually from an intrusion of material from Tidewater's dike northward into the original channel or from an upheaval of the bottom of the original channel caused by the downward pressure of dike material and dredged spoil on the saturated muck which formerly constituted the south bank of the Creek. The expense of restoring the channel area to its original condition would be substantial.

Plaintiff says that this diversion of the Creek indirectly resulted in a general raising of the level of the water of the Creek throughout the valley, which in turn caused a permanent "inundation" of a portion of plaintiff's property lying upstream from Tidewater's dike. Parenthetically, plaintiff has no quarrel with the change of the channel as such because that only took place along a stretch where the abutting land is owned by defendant.

In late 1962, the court viewed the Tidewater property and the land of plaintiff which was allegedly damaged as the result of Tidewater's diking operation. I describe this area in some detail because the testimony as to its condition prior to Tidewater's actions in the latter part of 1956 is very much in conflict. Plaintiff of course has the burden of establishing the material elements of her claim against the defendant.

The portion of property which plaintiff claims was "inundated" amounts to some seven or eight acres of land lying along Red Lion Creek and one of its connecting "tributaries". Plaintiff's father had used the area to graze a few cows. The surface of this area is relatively flat and under "normal" conditions hardly rises above the level of the water in the Creek. At the point where this portion of land joins the rest of plaintiff's property the ground rises abruptly to higher elevations and is covered with bushes and trees. Plaintiff's father described the disputed portion of ground as "embanked marsh". The ground at present is thickly covered with marsh grass or weeds but is saturated to such an extent that the pressure of walking upon the surface causes water to appear under foot.

Puddles of water are found on certain parts of this ground. Contrary to plaintiff's testimony I do not believe such condition is explained by the existence of springs. Considering the porous nature of the sub-surface material I think that in many instances at least the presence of water in this area can be attributed to sub-surface seepage, from the Creek. Thus, I think that plaintiff's description of this ground as "flooded" or "inundated" does not convey an accurate picture of its present condition.

Did the diversion of the Creek as a consequence of Tidewater's diking operation cause any measurable increase of water on this portion of plaintiff's land? Defendant's expert asserted at the trial that Tidewater's actions had not resulted in an increase of water on plaintiff's land, but he conceded that a loss of storage area in the Creek valley and a lengthening and constricting of the channel could result in an impounding of water in the Creek and a raising of the water level therein. Admittedly, Tidewater's actions resulted in an intrusion of new material into the Creek, and I am persuaded that the diversion of the stream resulted in a lengthening and constricting of its channel. I am of the opinion after examining the record and considering the circumstances present here that some increase of water did occur on plaintiff's land subsequent to the period when Tidewater was engaged in erecting its dike, and I am satisfied that such increase is attributable to the gradual diversion of the Creek in the manner described above.

Is Tidewater legally responsible for the damage, if any, caused to plaintiff by such "flooding"? The present case does not fall within the confines of cases dealing with dams or levees, since Tidewater's actions were not directed toward active control or manipulation of the waters of the Creek. Here the defendant has undertaken certain actions to improve its own land which only consequentially affected the flow of water in the Creek. Under applicable principles of negligence Tidewater owed a duty to plaintiff to exercise reasonable care in making such improvements so as not to cause an alteration in the normal flow of the stream and thereby cast significantly increased amounts of water on plaintiff's land. Here, defendant's employees who were engaged in erecting the dike were aware of the extremely soft character of the mud on which they were working and should have anticipated the consequences of placing a great mass of earthen dike material and dredged spoil on the bank. Indeed, the record shows that the filling in and upheaval of the bottom of the Creek were continually occurring to the knowledge of those in charge during the time the construction of the dike was taking place though it does not appear that the effect of such conditions on plaintiff's land was then known to them. I conclude that Tidewater is legally answerable to plaintiff for the increase in the amount of water which found its way onto

plaintiff's land as a consequence of the diversion of the Creek and the alteration of its physical characteristics.

■ The next question is whether plaintiff is entitled to the injunctive relief she seeks in view of the present physical condition of her land. A period of about six years has elapsed since the construction of defendant's restraining dike. At the time the dike was built and shortly thereafter the gradual displacement of the Creek from its former bed took place. During the period when the Creek was seeking a new outlet to the sluice gates, the existing channel evidently was not adequate to permit a proper flow downstream of the Creek's water. The result, as I indicated before, was to cause a measurable increase of water on the low-lying portion of plaintiff's property. Circumstances presently indicate, however, that the substantial adverse consequences to plaintiff's land resulting from the diversion of the Creek have been relieved by the action of natural forces on the topography of the Creek. The balance is in the process of a similar solution.

Plaintiff's expert conceded at the trial that to some extent the flow of water in the Creek would be improved as the water acted upon and wore down the barriers or impediments that served to constrict the present channel. Also, he indicated that a possibility existed that the stream would seek out and return to its original channel, and to some extent that process is already under way. The effect of these conditions has been and will be to lower the level of the water in Red Lion Creek. Also of significance here is the character of the ground we are dealing with and the fact that the Creek itself in the area of plaintiff's land is presently confined within well-defined boundaries. Having viewed the property in question at the time of the trial and again shortly before writing this opinion, I am satisfied that the present condition of plaintiff's land does not differ appreciably from its condition before Tidewater's actions and that the continuing action of the stream will in all probability have the effect in a short time of removing whatever Tidewater-caused saturation, if any, may presently exist there. Thus, I conclude that the harm to the plaintiff cannot be said to be irreparable so as to warrant the granting of a mandatory injunction.

Is plaintiff entitled to more than nominal damages? While there is some evidence in the record concerning damages, the emphasis of the parties in their briefs was on the question of injunctive relief. I will therefore give the parties, if they desire, an opportunity to brief that issue further.

Present order on notice.