S. William GREEN et al.,
Plaintiffs-Appellants,

v.

SANTA FE INDUSTRIES, INC., et al.,
Defendants-Appellees.

No. 157, Docket 75–7256.

United States Court of Appeals,
Second Circuit.

Argued Nov. 5, 1975.

Decided Feb. 18, 1976.

Rehearing Denied June 30, 1976.

Aaron Lewittes, New York City (Sidney Bender and Leventritt Lewittes & Bender, New York City, on the brief), for plaintiffs-appellants.

William R. Glendon, New York City (Guy C. Quinlan, Gene M. Bauer and Rogers & Wells, New York City, on the brief), for defendants-appellees Santa Fe Industries, Inc., Santa Fe Natural Resources, Inc., and Kirby Lumber Corp.

S. Hazard Gillespie, New York City (James W. B. Benkard, Charles R. Morgan and Davis, Polk & Wardwell, New York City, on the brief), for defendant-appellee Morgan Stanley & Co.

Before MEDINA, MOORE and MANSFIELD, Circuit Judges.

MEDINA, Circuit Judge:

S. William Green and others, shareholders of Kirby Lumber Corporation, individually and as such shareholders, suing on behalf of themselves and for the benefit of the corporation and for the class of all other minority shareholders of Kirby, appeal from an order of Judge Charles L. Brieant, Jr. in the Southern District of New York, dismissing their amended complaint for failure of subject matter jurisdiction and for failure to state a claim on which relief can be granted. The opinion below is reported at 391 F.Supp. 849.

This important, interesting and complicated case involves a claim, framed in a double aspect, by minority shareholders and the class they represent arising out of S.E.C. Rule 10b–5 concerning the purchase and sale of securities in interstate commerce in the setting of a short-form merger under the laws of the State of Delaware. These laws permit a majority of 90% or more of the shareholders of a Delaware corporation to squeeze out the minority without giving prior notice of the intention to do so, without any statement of a justifiable corporate reason for the merger and upon payment to the minority shareholders of an amount of dollars per share specified in the terms of the merger. The sole remedy of an objecting minority shareholder under these Delaware laws is to demand an appraisal of the value of his stock in a proceeding in the Delaware Court of Chancery.[1]

The double aspect of the claim asserted in the complaint is:

(1) that the Delaware procedure as applied to the facts of this case constitutes a "device, scheme, or artifice to defraud" because of the gross undervaluation by defendants of the shares the minority shareholders are forced to sell for $150 a share; and

(2) that without any misrepresentation or failure to disclose relevant facts, the merger itself constitutes a violation of Rule 10b–5 because the mulcting of the minority shareholders is accomplished by a breach by the majority of its fiduciary duty to deal fairly with the minority who in effect are the *cestuis* of the majority. This breach of fiduciary duty is the forcing of the minority to sell their stock at far less than it is worth against their will, and even without any opportunity to seek pre-merger relief from the courts, all for the enrichment of the majority who continue to hold their stock. All this is alleged to be done at the expense of the corporation without any corporate purpose justifying the expenditure.

Jurisdiction is based upon Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. Section 78aa, and exists only if the amended complaint contains allegations that on their face make out a case of fraud within the meaning of Section 10(b), 15 U.S.C. Section 78j(b) and S.E.C. Rule 10b–5, 17 C.F.R. 240.10b–5. We do not reach the pendent and diversity claims.

The judge and counsel for all parties wisely agreed, for the purposes of the motion to dismiss, to consider the entire Infor-

---

1. While the appraisal statute, Del. Code Ann. tit. 8 § 262 (1974) is silent on the exclusivity of the appraisal remedy, it is generally held exclusive as against one who complains of a short-form merger. See *Abelow v. Midstates Oil Corp.*, 41 Del.Ch. 145, 151, 189 A.2d 675, 679 (Sup.Ct.1963); *Stauffer v. Standard Brands Inc.*, 41 Del.Ch. 7, 9–10, 187 A.2d 78, 80 (Sup. Ct.1962). But see *Braasch v. Goldschmidt*, 41 Del.Ch. 519, 524, 199 A.2d 760, 764 (Ch.1964).

mation Statement, including the letter of Morgan Stanley & Co. of June 24, 1974, and all the annexed Exhibits, Schedules and Appraisals, as part of the amended complaint. They also agreed to treat the allegation that the purpose of the merger was to freeze out the minority shareholders as a charge that this was not done for any justifiable corporate purpose. The subject is discussed on this basis in the opinion below. We would not have mentioned this subject had it not been for the fact that the defendants in a footnote on page 9 of their main brief make a halfhearted claim that by not mentioning the lack of a business purpose in their main brief the appellants had "abandoned this position." We find no abandonment whatever of this very significant part of plaintiffs' claim. Appellants may have given this phase of their contentions less emphasis in order to keep Morgan Stanley & Co. in the case.

## I

We do not write on a clean slate. The background of judicial decisions is truly formidable, especially as the opinions contain so many dicta that may be thought by some to be ambiguous and so many seemingly unnecessary digressions. Accordingly, we think it will be helpful to an understanding of this opinion as a whole if we refer at the outset, and before our outline of the facts, to the holdings of this Court on two of the law points crucial to the disposition of this appeal.

■ *First.* It seems to be thought that it is a complete defense to show that defendants did exactly what the laws of Delaware required in order to effectuate a short-form merger. Under Delaware law the sole remedy of the dissenting minority shareholders is the Delaware appraisal proceeding.[2] But it is settled law in the Second Circuit that "Where Rule 10b–5 properly extends it will be applied regardless of any cause of action that may exist under state law." *Popkin v. Bishop,* 464 F.2d 714, 718 (2d Cir. 1972). *See also Vine v. Beneficial Finance Co.,* 374 F.2d 627,

635–36 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); *Levine v. Biddle Sawyer Corp.,* 383 F.Supp. 618, 622 (S.D.N.Y.1974). So, here, the principal if not the sole question we have to decide is whether or not plaintiffs have stated a claim arising out of Rule 10b–5. The legal reasoning supporting this holding is, we think, that the states have no power to preempt Congress in the creation of substantive rights and remedies arising from purchases and sales of securities in interstate commerce. Neither Delaware nor any other state may do more than create substantive remedies that are not preemptive or exclusive but must compete with other properly constituted remedies in the market place where the most effective and least costly of those procedures may be expected to prevail. The remedies available to redress violations under the Securities Exchange Act are supplementary to those provided by the states and they may not be abrogated merely by the coincidental availability of an alternate or corollary state remedy. Furthermore, the fact that a state has chosen to create a particular remedy for a particular injury in no way precludes the Congress from creating an additional form of relief for another injury. Thus, the fact that a shareholder claiming fraud both in the consummation of a merger not based on any justifiable corporate purpose and in the undervaluation of his shares may under state law only resort to an appraisal proceeding that merely ameliorates the undervaluation does not foreclose the right of the Congress and the federal courts to provide that claimant an additional right and remedy to redress any injury flowing from a fraud inherent in the merger itself.

■ *Second.* Another erroneous assumption is that in order to allege a claim under Rule 10b–5 there must be some showing of misrepresentation or lack of disclosure. This is one of the grounds stated by Judge Brieant in the court below for his dismissal of the complaint. 391 F.Supp. 849, 854–55. But only subdivision (2) of 10b–5 deals with nondisclosure and misrepresentation. The

2. *See* note 1 *supra.*

Rule contains two other subdivisions which state explicitly that fraud other than and in addition to a failure to disclose or truthfully represent is also actionable:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

\* \* \* \* \* \*

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

It must be that the failure to observe this broader scope of Rule 10b–5 led the court below to dismiss the complaint, even accepting "plaintiffs' claimed valuation" and assuming the truth of the allegations of the complaint to the effect that the stock was grossly undervalued and that there was no justifiable corporate reason for the merger. Our later review of the decisions of this Court on the subject of allegations under Rule 10b–5 of breaches of fiduciary duty by a majority against minority shareholders without any charge of misrepresentation or lack of disclosure will, we think, demonstrate that in such cases misrepresentation or lack of disclosure are not essential ingredients of the claim for relief by the minority. But, lest there be any lingering doubt on this point, we now hold that in such cases, including the one now before us, no allegation or proof of misrepresentation or nondisclosure is necessary.

▉ As with other laws Rule 10b–5 must be interpreted and applied so as to accomplish the purpose for which it was intended. That this requires a generous reading is too obvious for comment. Since the time to which the memory of man runneth not to

the contrary the human animal has been full of cunning and guile. Many of the schemes and artifices have been so sophisticated as almost to defy belief. But the ordinary run of those willing and able to take unfair advantage of others are mere apprentices in the art when compared with the manipulations thought up by those connected in one way or another with transactions in securities. This is especially true of schemes that seem to be absolutely safe but offer rich rewards. In these days when there are takeovers and tender offers galore, times when those who used to think of going public now think of becoming private again, it is especially important to give Rule 10b–5 its full scope. If this is to be done, the enforcement of the fiduciary duty owed by the majority to the minority in corporations large and small should not be overlooked.

At this stage of the proceedings in this case we need not concern ourselves with the federal rules to be formulated relative to the ascertainment of the true value of the shares now held by the minority nor the specific remedy to be applied should the plaintiffs prevail.

We also recognize that we are only dealing now with the allegations of the complaint, which we must assume to be true. The defendants may prove that there has been no breach of fiduciary duty by the majority. More of this later.

▉ Without further discussion we think it is clear that the case relates to the purchase and sale of securities in interstate commerce,[3] that the plaintiffs are indeed forced sellers,[4] and that there is a causal relation between the alleged breach of fiduciary duty by the majority and the injury suffered by the complaining owners of the minority stock interest.

## II

Prior to July 31, 1974, plaintiffs were minority shareholders of Kirby Lumber Co.,

**3.** *Vine v. Beneficial Finance Co.,* 374 F.2d 627, 634 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); *Popkin v. Bishop,* 464 F.2d 714, 718 n. 8 (2d Cir. 1972).

**4.** *Vine v. Beneficial Finance Co., supra,* at 635.

a Delaware corporation. For some years prior to the merger transactions involved here, approximately 95% of the capital stock of Kirby was owned by defendant Santa Fe Natural Resources ("Resources") which in turn is a wholly-owned subsidiary of defendant Santa Fe Industries, Inc. ("Santa Fe").

In July, 1974, Resources embarked upon a plan to effect a short-form merger pursuant to Section 253 of the Delaware Corporation Law, which permits a parent corporation owning at least 90% of the capital stock of a subsidiary to merge the parent and the subsidiary, upon approval by the parent's Board of Directors and shareholders. Accordingly, a fourth corporation, Forest Products, Inc. ("Forest Products"), was organized in July as a Delaware corporation. Resources transferred approximately 95% of the capital stock to Forest Products, together with cash and the assumption of certain liabilities, in exchange for all of Forest Products's capital stock.

Shortly thereafter, the board of Forest Products adopted a Section 253 merger resolution providing that Forest Products would be merged into Kirby, with Kirby as the surviving corporation. Since such a merger resolution may provide that all shares held by minority shareholders will be purchased for cash, and consent of the minority shareholders is not required, the resolution stipulated that the minority shareholders of Kirby would have the right to receive $150 per share or to seek appraisal for their stock, as permitted by the Delaware statute. The merger became effective on July 31, 1974. In accord with Delaware Corporation Law Section 253(b), "new" Kirby notified the shareholders of "old" Kirby of the merger and of their rights, and sent a detailed financial Information Statement regarding Kirby.

None of the plaintiffs tendered any of the stock of Kirby. Instead, on August 21, 1974, they made a demand for appraisal of their Kirby stock. On September 9 of that same year, however, they purported to withdraw that demand, and on September 10, they commenced this lawsuit.

The gravamen of their complaint, in which the prayer for relief is that the merger be rescinded, that plaintiffs be awarded money damages or such other and further relief as may be just, is that the short-form merger resulted in the acquisition of the minority shares at a "grossly undervalued price." That undervaluation, they claim, combined with the corporation's failure to disclose the merger to plaintiffs until after its completion, and the fact that, as they say, the merger was effected without any business purpose, constituted a manipulative and deceptive device in breach of Rule 10b–5 and a common law breach of the fiduciary duty owed to Kirby and its minority shareholders. Since an opinion from Appraisal Associates, contained in the Information Statement sent to Plaintiffs, valued Kirby's land and timber at $320 million, plaintiffs contend that the appraisal of the minority shares should have been at least equal to $772 per share. The statement to the minority shareholders presented the alternative of cash amounting to $150 per share or a valuation by the courts if requested. The $150 per share was based upon the opinion of Morgan Stanley & Co. which concluded:

Based on our studies as outlined above, and on the assumptions that (i) the shares of Kirby were broadly distributed and freely traded such that willing buyers and willing sellers could readily effect transactions and (ii) the shares were split so that they would trade within the range of prices typical for many publicly-held companies, we are of the opinion that, under current market conditions, the price at which Kirby stock would trade would be the equivalent of $125 a share.

This opinion was expressed in a letter of June 24, 1974, which in turn was based upon a detailed study of the business affairs of Kirby Lumber Corporation, including a review of financial statements and appraisals of the Company's properties as set forth in elaborate schedules attached to the Information Statement. All plaintiffs' claims with respect to the alleged "fraudulent" and "unconscionable" undervaluation of the stock are based upon what was thus

disclosed to the shareholders prior to the merger in the Information Statement.

## III

### *The Law*

#### A

##### *The Delaware Corporation Laws*

Many years ago the State of Delaware through its legislature established a series of corporation laws thought to be favorable to corporate management and designed to attract corporations to the state for the purpose, among others, of raising revenue for the state and furnishing business for the members of the legal profession located in Delaware. Many of these laws were copied in other states for similar purposes. Without making a long story of it, some of these laws were intended to facilitate the squeezing out of minority shareholders. Of these laws, the one with which we are principally concerned here made elaborate provisions for a short-form merger under Section 253 of the Delaware Corporation Law. The salient feature of this short-form merger was that a majority of 90% of the shareholders could eliminate the 10% minority without any vote of the shareholders, without prior notice to the minority shareholders, without any statement of corporate purpose and by fixing an amount to be paid per share to the minority shareholders, who were given the option of selling their shares at the stipulated price or demanding an appraisal under the auspices of the Delaware Court of Chancery, pursuant to the terms of Section 262 of the Delaware Corporation Law. We are told that the avowed purpose of these laws was to wipe out the minority.[5] The Delaware courts have held that the sole remedy of the minority shareholders is to demand the appraisal and be paid the amount per share fixed by the appraisal.[6] No opportunity is afforded the minority shareholder in advance of the date when the merger becomes effective to apply to any court for injunc-

tive relief to stop the merger, nor is there any provision for rescission or other relief.

The Delaware laws also permit a long-form merger in cases where the majority have control but not 90% of the stock. In such cases prior notice is required and an opportunity is afforded to apply to a court for injunctive relief. In this class of mergers a vote of the shareholders is necessary.

In the case of a short-form merger, if the majority decides to fix the price to be paid to the minority shareholders at a figure substantially less than the shares are worth and the merger becomes effective and the minority shareholders turn in their stock and receive from the corporation the amount stipulated to be paid, all in the absence of any stated corporate purpose, the corporation pays for the stock bought from the minority shareholders, the minority shareholders are squeezed out and the entire benefit of the transaction inures to the majority shareholders. The corporation receives no advantage, and may in fact suffer detriment, and by the elimination of the shares of stock of the minority the majority's shares become more valuable. Plaintiffs claim this is just such a case.

#### B

##### *Where a Breach of Fiduciary Duty by Majority Shareholders with Resulting Detriment to the Minority Is Alleged as in this Case, No Claim of Misrepresentation or Lack of Disclosure Is Required to Make Out a Case Under Rule 10b–5*

■ The main thrust of the decision below is that to state a preliminary case under rule 10b–5 there must be misrepresentation or lack of disclosure even in the presence of a breach of fiduciary duty. We disagree. While the "fraud" at which 10b–5 is aimed obviously includes the classic examples of misrepresentation and nondisclosure inveighed against in *Ruckle v. Roto American Corp.*, 339 F.2d 24 (2d Cir. 1964) and *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), it

---

**5.** See *Stauffer v. Standard Brands Inc.,* 40 Del.Ch. 202, 178 A.2d 311, 314 (Ch.1962), *aff'd,* 41 Del.Ch. 7, 187 A.2d 78 (Sup.Ct.1962).

**6.** See note 1 *supra.*

is by no means limited to that type of illegality. As the Court stated in *S. E. C. v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194, 84 S.Ct. 275, 284, 11 L.Ed.2d 237, 247 (1963), quoting from *Moore v. Crawford,* 130 U.S. 122, 128, 9 S.Ct. 447, 448, 32 L.Ed. 878, 880 (1888):

> Fraud, indeed, in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another.

The Court has previously made clear that Section 10(b) was not intended to be a panacea for all corporate ills and management wrongdoing, *Superintendent of Ins. v. Bankers Life and Casualty Co.,* 404 U.S. 6, 11–12, 92 S.Ct. 165, 168, 30 L.Ed.2d 128, 133–134 (1971). But it has also directed that "[s]ection 10(b) must be read flexibly, not technically and restrictively." *Id.,* at 12, 92 S.Ct. at 169, 30 L.Ed.2d at 134. *See also A. T. Brod & Co. v. Perlow,* 375 F.2d 393, 396–7 (2d Cir. 1967). We have followed that mandate.

▮ In *Schoenbaum v. Firstbrook,* 405 F.2d 215 (2d Cir. 1968) (*en banc*), *cert. denied sub nom., Manley v. Schoenbaum,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), we focused on the question whether improper self-dealing and breach of fiduciary duty by the majority, without more, constituted a violation of 10b–5. Answering that question in the affirmative, Judge Hays, writing for the majority, emphasized subdivision (3) of 10b–5 and held that a preliminary cause of action under that Rule had been stated. Breach of fiduciary duty and fraud on the *cestuis* and the corporation had been committed, on the facts as alleged, when Banff sold its shares to Aquitaine at an inordinately low price after the directors had learned of the important oil discovery and before that information had been made public, even though there had been neither misrepresentation nor failure to make any required disclosure to the minority. The decision echoes the well-estab-

lished principles enunciated in *Pepper v. Litton,* 308 U.S. 295, 306–7, 60 S.Ct. 238, 245, 84 L.Ed. 281, 288–9 (1939), that directors and controlling shareholders are fiduciaries.

> Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.

*Id.,* at 306, 60 S.Ct. at 245, 84 L.Ed. at 289. When controlling shareholders of a publicly held corporation use corporate funds to force extinction of the minority shareholders' interest for the sole purpose of feeding the pocketbooks of the controlling shareholders, such conduct goes beyond mere negligent mismanagement and is properly cognizable as "an act, practice, or course of business which operates or would operate as a fraud * * *." The majority has abused its equitable powers by exercising them for the "aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis.*" *Pepper v. Litton, supra,* at 311, 60 S.Ct. at 247, 84 L.Ed. at 292. *See also Drachman v. Harvey,* 453 F.2d 722, 736 (2d Cir. 1972) (*en banc*).

Our finding of fraud inherent in the freezing out of a splinter interest in the context of a "going private" transaction that lacks corporate purpose is not without scholarly or judicial support. *See, e. g., Bryan v. Brock & Blevins Co., Inc.,* 490 F.2d 563 (5th Cir.), *cert. denied,* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974); *Voege v. American Sumatra Tobacco Corp.,* 241 F.Supp. 369, 375 (D.Del.1965) ("Plaintiff at bar was the subject of deception for when she acquired her stock she did so upon the justifiable assumption that any merger would deal with her fairly, only later to find, according to the complaint, that the terms of the merger were designed to defraud her."); Borden, *Going Private—Old Tort, New Tort, or No Tort?* 49 N.Y.U.L. Rev. 987 (1974); *Note, Going Private,* 84

Yale L.J. 903 (1975); Vorenberg, *Exclusiveness of the Dissenting Stockholder's Appraisal Right,* 77 Harv.L.Rev. 1189 (1964).

Most recently in *Marshel v. AFW Fabric Corp.,* 533 F.2d 1277 (2d Cir. 1976), we were faced with the question whether a merger lacking any justifiable corporate purpose and effected under the New York long-form merger statute might be challenged by minority shareholders under Rule 10b–5. Notwithstanding the absence of any allegation of misrepresentation or non-disclosure, we granted the shareholders' motion for a preliminary injunction against the proposed merger and held that a cause of action under Section 10(b) and Rule 10b–5 is stated "when controlling stockholders and directors of a publicly-held corporation cause it to expend corporate funds to force elimination of minority stockholders' equity participation for reasons not benefiting the corporation but rather serving only the interests of the controlling stockholders * * *." Like the Delaware provisions, the New York merger statutes provide an appraisal remedy for the complaining minority shareholders. In addition, however, since prior shareholder approval is required in the instance of the long-form merger, the shareholders in *Marshel* were also afforded the opportunity to seek pre-merger injunctive relief. We regard the unavailability of this additional remedy in the case before us as further justification for the intervention of the federal courts to remedy any fraudulent conduct.

■ We hold that a complaint alleges a claim under Rule 10b–5 when it charges, in connection with a Delaware short-form merger, that the majority has committed a breach of its fiduciary duty to deal fairly with minority shareholders by effecting the merger without any justifiable business purpose. The minority shareholders are given no prior notice of the merger, thus having no opportunity to apply for injunctive relief, and the proposed price to be paid is substantially lower than the appraised value reflected in the Information Statement. We do not hold that the charge of excessively low valuation by itself satisfies the requirements of Rule 10b–5 because that is not the case before us.

## C

### *Popkin v. Bishop, 464 F.2d 714 (2d Cir. 1972) Is Distinguishable and the Ruling in that Case Impliedly Supports Our Decision in this Case*

Curiously enough both sides in the case before us rely upon *Popkin* as controlling. That was a long-form merger case under the New York counterpart of the Delaware long-form merger law. There was no basis for a short-form merger as the majority control was 51.7%, far less than the 90% required for a short-form merger. Accordingly, prior shareholder approval of the merger was required and the minority interest was given an opportunity, prior to the consummation of the merger, to sue for injunctive relief to stop the merger. There was no showing of misrepresentation or lack of disclosure and, accordingly, the complaint was dismissed. The principal feature of *Popkin* that distinguishes it from the case before us is that in *Popkin* there was a corporate business purpose so strong as to be as a practical matter compelling. This purpose arose from a stipulation made in a prior New York state suit one of the principal terms of which was that the merger be consummated, evidently for the purpose of avoiding the possibility of future management misconduct. (464 F.2d at 716). Thus the court held that plaintiffs in *Popkin* had no Rule 10b–5 claim.

■ The reasoning of *Popkin* also supports the conclusion we reach here to the effect that the allegation of breach of fiduciary duty owing by the majority to the minority states a 10b–5 violation without a showing of misrepresentation or lack of disclosure. *Popkin* holds that the primary reason misrepresentation or lack of disclosure was required was that shareholder approval was necessary. "In the context of such transactions [*i. e.,* those for which shareholder approval is required], if federal law insures that shareholder approval is fairly sought and fully given, the principal federal interest is at an end." 464 F.2d at 720

[material supplied]. The plain implication is that in cases such as the short-form merger, where no shareholder approval is required, there is no need for a showing of misrepresentation or lack of disclosure to make out a 10b–5 case. As the *Popkin* court stated,

> In many, if not most, corporate self-dealing transactions touching securities, state law does not demand prior shareholder approval. In those situations, it makes sense to concentrate on the impropriety of the conduct itself rather than on the "failure to disclose" it because full and fair disclosure in a real sense will rarely occur.

464 F.2d at 719. Whether full disclosure has been made is not the crucial inquiry since it is the merger and the undervaluation which constitute the fraud, and not whether or not the majority determines to lay bare their real motives. If there is no valid corporate purpose for the merger, then even the most brazen disclosure of that fact to the minority shareholders in no way mitigates the fraudulent conduct. This is the substance of plaintiffs' reliance on *Popkin* here, and we agree.

It may well be that, in view of the fact that the majority's 51.7% control made it inevitable that minority opposition would be futile, any requirement of misrepresentation or lack of disclosure was illusory. Whether or not this criticism of *Popkin* is justified is, we think, for another day.

## IV

*The Allegations of the Amended Complaint Fail to State a Claim Under Rule 10b–5 Against Morgan Stanley & Co.*[7]

 As we have already said, we do not now hold that an allegation of substantial undervaluation, standing alone, makes out a Rule 10b–5 case in a Delaware short-form merger setting. We deal here with the additional elements of lack of a justifiable

corporate purpose for the merger and the fact that the Delaware law provides for no prior notice to the minority shareholders thus depriving them of the opportunity to apply for injunctive relief, as well as the allegations of undervaluation. Morgan Stanley & Co.'s involvement in the merger was strictly limited to the valuation of stock and to the compilation of a report detailing the company's financial status. There is no allegation that Morgan Stanley & Co. engaged in any misrepresentation or nondisclosure such as would support its liability under Rule 10b–5(2).

We find no intimation in the amended complaint or in any of the briefs that Morgan Stanley & Co. had anything whatever to do with the planning of the merger or that it had any knowledge as to whether or not there existed a justifiable corporate purpose for the merger. And, of course, Morgan Stanley & Co. cannot be, and has not been, charged with any responsibility for effectuating the procedural steps incidental to the merger or for implementing the Delaware law and its provision for shareholder notice only after the merger has become effective. Most importantly, Morgan Stanley & Co. has not been charged with participation in the majority shareholders' breach of fiduciary duty, a key element of the latter's 10b–5 liability.

Even with respect to the alleged undervaluation of the stock we think the conclusory allegations that Morgan Stanley & Co. acted wilfully, as an accessory and as an aider and abettor in setting the value of the Kirby shares are plainly insufficient. The Information Statement itself, including the Morgan Stanley letter of June 24, 1974, and the Schedules and Exhibits attached to these documents, shows on its face that there was no wilful or other representation by Morgan Stanley & Co. that the Kirby shares should be valued at $150. All that Morgan Stanley & Co. did, or was asked to do, was to assemble and present for the

---

7. Of course, the separate position of Morgan Stanley & Co. was not even discussed by Judge Brieant in his opinion as he held that no Rule 10b–5 case had been alleged against any of the

defendants because of the absence of any allegation of misrepresentation or lack of disclosure.

consideration of the Kirby management and the minority shareholders the data and information, including the price at which the shares would probably be publicly or privately traded, which would enable the minority shareholders to make an intelligent decision as to whether to surrender their stock in return for $150 a share or apply to the Delaware Court of Chancery for an independent valuation of the stock. It is not even alleged that Morgan Stanley & Co. had anything to do with the decision by the majority shareholders to fix the offering price at $150 a share, thereby adding an increment of $25 to the fair market value as appraised by Morgan Stanley & Co., perhaps in the interest of leading the minority shareholders to believe that the offer was a generous one. Finally, it is not alleged that Morgan Stanley & Co. received any benefit or unjustly profited in any direct or indirect manner by its appraisal.

A copy of the letter of Morgan Stanley & Co. of June 24, 1974, is set forth in the margin.[8] We think the reference to "fair market value" in the first paragraph as

well as the entire last paragraph of the letter is to current sales of shares of Kirby stock on some stock exchange, or otherwise, a subject in which the minority shareholders might be expected to be interested. The record is barren of any information on the subject of public or private trading in shares of this publicly owned stock. Nor do any dates of purchase and sale transactions appear in the record, except certain purchases by affiliates at prices ranging from $65 per share in 1968 to $90 per share in 1973 in one of the Exhibits attached to the Information Statement. We are inclined to suspect, in the absence of any statement on this point in the complaint or in the briefs, that the reason for the estimate by Morgan Stanley & Co. was that there was no public or private market for the stock.

Thus, absent any claim that Morgan Stanley & Co. was in any way involved in planning or effectuating the merger, or that it shared in the alleged profiteering and faithless conduct of the majority shareholders, appellants' summary allegations that the Company participated in fraudu-

8. Morgan Stanley & Co.
 1251 Avenue of the Americas
 New York, N.Y. 10020
 June 24, 1974
 Mr. John C. Davis
 Vice President
 Sante Fe Industries, Inc.
 224 South Michigan Avenue
 Chicago, Illinois 60604
 Dear Mr. Davis:
 You have asked that we furnish an opinion as to the present fair market value of a share of capital stock of Kirby Lumber Corporation ("Kirby" or the "Company"), a subsidiary of Sante Fe Natural Resources, Inc. We understand that 25,324.5 shares or approximately 5.1% of the Company's outstanding capital stock constitutes the minority interest.
 In connection with our study of the Company for purposes of making our valuation, we have toured the Company's facilities and have had discussions with management regarding the Company's business. We have been furnished with and have reviewed the Company's audited financial statements for the five years ended December 31, 1973, and the unaudited financial statements for the four-month period ending April 30, 1974. We have reviewed the Company's five-year forecast for the years 1974–1978 and have discussed it and the general future outlook

for the Company with its management. Also, we have reviewed the written appraisals of the Company's properties and mineral rights which were separately performed by Appraisal Associates and Riggs and Associates.
 We have studied the Company's financial position and its operating history and have made comparisons of such information with the financial position and operating histories of other companies in the forest products industry, the securities of which are publicly held and actively traded.
 We have, in addition, considered such other matters and made such other studies as we considered necessary or pertinent.
 Based on our studies as outlined above, and on the assumptions that (i) the shares of Kirby were broadly distributed and freely traded such that willing buyers and willing sellers could readily effect transactions and (ii) the shares were split so that they would trade within the range of prices typical for many publicly-held companies, we are of the opinion that, under current market conditions, the price at which Kirby stock would trade would be the equivalent of $125 a share.
 Very truly yours,
 /s/ Morgan Stanley & Co.

lently undervaluing the minority shares fails to state a claim under Rule 10b–5.

## V

### Conclusion

The provisions of the Delaware corporation laws relative to short-form mergers have been the subject of favorable and unfavorable comment for years. One of the Commissioners of the SEC has made a speech on the subject. The SEC has circulated certain proposed new rules.[9] Law professors, practicing lawyers and student editors of law reviews have had their say. We do not think it would be profitable to comment on any of this, except to say that we have read all this material and given it the consideration we think it deserves.

We have also refrained from comment on the remedy to be applied, in the event that plaintiffs succeed at the trial, or on the thorny subject of how in such event a proper valuation of the stock is to be made. These are questions proper for consideration at the trial level, after all the proofs are in. In view of the conclusions at which we have arrived, we do not reach the pendent or diversity claims.

With respect to defendant Morgan Stanley & Co. the order and judgment appealed from are affirmed. As to the other defendants the order and judgment appealed from are reversed.

MANSFIELD, Circuit Judge (concurring):

I concur in Judge Medina's opinion holding that a short-form merger consummated without any legitimate corporate purpose and without any advance notice to the minority public stockholders, resulting in harm to the latter, violates Rule 10b–5. By using the short-form merger device in this fashion the majority commits a wrong that extends beyond mere mismanagement of corporate affairs; the majority also breaches its duty as a fiduciary to deal fairly with the public investors, and, by acting unilaterally and without any advance notice, deprives them of the opportunity to seek relief based on the absence of any legitimate corporate purpose. The resulting merger amounts to a "manipulative or deceptive device or contrivance" which operates as a fraud on public stockholders of the type intended to be proscribed by § 10(b) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder. Upon a showing that the merger had no legitimate corporate purpose, the district court should, if feasible, set it aside or, if the merger cannot effectively be voided,[1] award damages representing the difference between the fair buy-out price and the unfair, unilateral buy-out price set by the corporate insiders.[2] Such relief is not barred by the co-availability of state law remedies. *Superintendent*

---

**9.** Proposed Rules 13e–3A and 13e–3B, 2 Fed. Sec.L.Rep. ¶¶ 23,704–05; Securities Act Release No. 5567 (1975), [Current] CCH Fed.Sec.L.Rep. ¶ 80,104. The proposed rules would subject short-form mergers and other share repurchase transactions to comprehensive regulation. Significantly, the rules would require that the issuer have a valid corporate purpose for any repurchase of minority shares in connection with a short-form merger and that the terms of such a transaction, including any consideration to be paid to the minority shareholders, be fair.

**1.** Ordinarily in providing relief a court faces difficulties in setting aside a consummated merger. However, in the case of a short-form merger, the sole functional difference between the pre- and post-merged entities is the absence of the "frozen-out" public shareholders from the latter. Therefore, unless the parties materially and in good faith had relied upon the merg-

er, the court in equity should be able to undo the unlawful effects of the short-form device by restoring the public shareholders to their pro-rata share of ownership.

**2.** As Judge Medina notes, for purposes of this appeal we are to assume that the $150 per share offered by Kirby to the public shareholders is inadequate and that the correct buy-out price equals $772 per share, a sum derived by a pro-rata division of Kirby's appraised assets. Should the district court decide that legal and not equitable relief is appropriate here, it, of course, would be required to determine a fair buy-out price, cf. *Knauff v. Utah Construction & Mining Co.*, 408 F.2d 958 (10th Cir.), *cert. denied*, 396 U.S. 831, 90 S.Ct. 83, 24 L.Ed.2d 81 (1969); *Levin v. Great Western Sugar Co.*, 406 F.2d 1112 (3d Cir.), *cert. denied*, 396 U.S. 848, 90 S.Ct. 56, 24 L.Ed.2d 97 (1969), in the same manner as damages ordinarily are ascertained in a Rule 10b–5 action.

*of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 168, 30 L.Ed.2d 128, 134 (1971); *Vine v. Beneficial Finance Co.,* 374 F.2d 627, 635–36 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); *Popkin v. Bishop,* 464 F.2d 714, 718 (2d Cir. 1972).

Inherent in the act of "going private" through a short-form merger is an enormous potential for abuse of the corporate insiders' fiduciary position with respect to the "frozen out" public shareholders. Essentially, by "going public" when the stock market is flourishing and squeezing out the public shareholders when the market is depressed, the majority is able to manipulate the sale and purchase of stock to its benefit and to the detriment of the public shareholders, depriving the latter involuntarily of their investment in the corporation, see Vorenberg, *Exclusiveness of the Dissenting Shareholder's Appraisal Right,* 77 Harv.L. Rev. 1189 (1964), at a buy-out price unilaterally selected by the insiders, which they have every incentive to fix below the fair value of the public shareholders' interest. Brudney and Chirelstein, *Fair Shares in Corporate Mergers and Takeovers,* 88 Harv. L.Rev. 297, 298 (1974).

The unfairness and conflicts of interests generated by "going-private" mergers have not been lost on the business community. For example, Dun's Review, January, 1975, at 37, reports:

> "However one looks at it 'going private' is most often a no-win situation for public shareholders. For the buy-out price is almost always a small fraction of what the investor paid for the stock. The price, moreover is determined by a consultant hired by the buyers. The investors have a choice of taking what is offered or holding a stock that is no longer readily marketable. And the insiders have formidable legal devices available to fight investors who refuse the company's offer.
>
> \* \* \* \* \* \*
>
> "Not only are the offering prices in buy-outs far below what they paid, investors claim, they often do not reflect the cur-

rent financial strength of the company any more than the market price does." *Id.* at 38.

The Wall Street Journal, October 18, 1974, at 1 concurs, stating:

> "[a] move to go private ordinarily creates a conflict of interest . . . [as] controlling shareholders who directly or indirectly finance the move often are buying back their interests at only a fraction of the price at which they originally were sold to the public. . . ."

And Barron's, March 4, 1974, at 3, 13, warns:

> "Generally, it is the low price of the stock, rather than declining earnings which sends firms private. . . . Admittedly, there are times when it appears that stockholders have been had. Indeed, figures indicate that the ones benefiting most from buying back the stock are the people who sold it to the public in the first place."

In conclusion, Business Week, November 2, 1974, at 114, editorializes:

> "[T]here is a distinctly bad smell about a deal that produces a substantial loss for the majority of the shareholders and a fat profit for a tiny minority."

My purpose in referring to these current appraisals of the short-form merger device by those who have observed it in action is not to impugn the motives of the defendants in this case but to emphasize that the problem created by misuse of the short-form merger is not merely one of regulating "transactions which constitute no more than internal corporate mismanagement," *Superintendent of Insurance v. Bankers Life & Cas. Co., supra,* 404 U.S. at 12, 92 S.Ct. at 169, 30 L.Ed.2d at 134, but one of protecting the public investor against manipulative devices used to deceive him, and the securities market from devices serving to discredit it, which together form the primary functions of the anti-fraud and anti-manipulation provisions of Rule 10b–5. The short-form merger, when used to squeeze out small public investors by forcing them to relinquish their corporate investments at low prices for no purpose oth-

er than to benefit the insiders, can accurately be characterized as a "manipulative or deceptive device or contrivance," *id.* at 10, 92 S.Ct. at 168, 30 L.Ed.2d at 133, which interferes with the interests of the public shareholders in the most fundamental of ways, by depriving the investor of his very interest in his corporate investment. It also undercuts the broader purpose of "preserving the integrity of the securities markets," *id.* at 12, 92 S.Ct. at 169, 30 L.Ed.2d at 134, for a clearer instance of potential abuse of the market processes cannot be found. Commenting on the use of the short-form merger, SEC Commissioner Sommer has stated:

> "What is happening is, in my estimation, serious, unfair, and sometimes disgraceful, a perversion of the whole process of public financing, and a course that inevitably is going to make the individual shareholder even more hostile to . . the securities markets than he already is." ([1974–75] Fed.Sec.L.Rep. ¶ 80,010 at 84,695)

To immunize the short-form merger from the coverage of Rule 10b–5 merely because state law has authorized the device to be used for the purpose of squeezing out the public shareholders without giving them prior notice or an opportunity to obtain injunctive relief would be to ignore the central protective purposes underlying federal securities legislation and to countenance an anomalous result. Those who are most exposed and most vulnerable—the small outside public shareholders who are not privy to the inner workings of the corporate enterprise and who are forced to accept a unilaterally imposed result—would be the least protected. If they are to enjoy the protection intended to be furnished by 10b–5, that rule must not be interpreted in a technical or niggardly fashion.

When we were first called upon more than a decade ago to decide whether certain types of fraudulent corporate practices or devices fell within the proscriptions of Rule 10b–5, our initial tendency was to adhere rather closely to the elements of common law fraud (misrepresentation, reliance, scienter) in interpreting Rule 10b–5. See, e. g., *O'Neill v. Maytag,* 339 F.2d 764, 768 (2d Cir. 1964). Moreover we considered it essential that the fraud, to be actionable under the rule, must be intrinsic to the securities transaction itself. See, e. g., *Superintendent of Insurance v. Bankers Life & Cas. Co.,* 430 F.2d 355 (2d Cir. 1970), *aff'g,* 300 F.Supp. 1083 (S.D.N.Y.), *rev'd,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Beginning in *A. T. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir. 1967), and in *Schoenbaum v. Firstbrook,* 405 F.2d 215 (2d Cir. 1968) (en banc), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), however, we recognized that the ambit of the term "fraud" as used in 10b–5 must be widened if Congress' objective—protection of the public investor—was to be achieved. Furthermore, since only section (2) of 10b–5 deals with misrepresentation and non-disclosure, a broader definition of fraud would give effect to the prohibitions of sections (1) (employment of "any device, scheme or artifice") and (3) (engaging in "any act, practice or course of business which operates . . . as a fraud"), which disclose a broad intent to prohibit other forms of fraud. Accordingly in *Schoenbaum* we broke new ground to the extent of holding that where there was improper self-dealing and abuse of fiduciary responsibility by majority shareholders, disclosure of material facts to interested insiders would not preclude public stockholders, who were not privy to the scheme, from holding the controlling wrongdoers liable under 10b–5 for treating the public investors unfairly, even though the technical niceties of common law fraud had not been met. See Folk, *Corporation Law Developments,* 56 Va.L. Rev. 755, 806–07 (1970).

The recognition that "fraud" as that term is used in § 10(b) must be interpreted broadly was given further impetus by the Supreme Court's decision in *Superintendent of Insurance v. Bankers Life & Cas. Co., supra,* where, in holding that fraud forming the basis of a 10b–5 suit need not be intrinsic to the securities transaction itself, the unanimous Court stated that "Section 10(b) must be read flexibly, not technically or

restrictively," 404 U.S. at 12, 92 S.Ct. at 169, 30 L.Ed.2d at 134. In line with this philosophy we, in *Drachman v. Harvey,* 453 F.2d 722 (2d Cir. 1972) (en banc), reconfirmed the stand taken in *Schoenbaum* and, in a suit by public investors, held corporate directors liable under 10b–5 for their conduct in calling back their corporation's convertible debentures at an excessive price in order to prevent conversion into common stock, which would have weakened the opportunity of a third party, with whom the directors were in conspiracy, to obtain control of the company. Judge Smith's dissent, later accepted by the court sitting en banc, did not place reliance upon evidence of misrepresentation or non-disclosure, but instead emphasized "that here the directors of Harvey, influenced by a conflict of interest and acting to support Martin's controlling interest," caused "the corporation [to] sustain . . . damage. . . ." This was considered sufficient to allege a Rule 10b–5 violation under the "broad and liberal reading" required by the rule. *Id.* at 735. More recently, in *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 381 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), in upholding 10b–5 liability we again de-emphasized the importance of alleged misrepresentations as "only

one aspect" or "a part" of the illegal scheme that had at its core "market manipulation" and, as here, "a merger on preferential terms. . . ."

Defendants place heavy reliance upon *Popkin v. Bishop,* 464 F.2d 714 (2d Cir. 1972), as representing a departure from our steady trend toward an expansive view of the reach of the federal security laws. However, to the extent that *Popkin* is at all relevant to the short-form merger context, it impliedly supports the application of the *Schoenbaum-Drachman* rule to this case.[3] In *Popkin,* unlike the present case, *prior* stockholder approval of the proposed merger was required. Full *advance* disclosure of the relevant facts regarding the merger exchange ratios to the minority stockholders was effective protection because it gave them the opportunity, as Judge Feinberg noted, to seek state court injunctive relief which was purportedly available under Delaware law. *Id.* at 720. Here, in contrast, disclosure *after* the merger has been consummated is virtually the equivalent of no disclosure at all, since it comes too late to enable the minority to invoke state law for protection against an unwarranted squeeze-out. Indeed, it is well recognized that the state post-merger appraisal procedure does not provide an alternative remedy comparable to federal relief.[4] Only through liberal

---

**3.** For support of this proposition in the literature, see Comment, *Schlick v. Penn-Dixie Cement Corp.: Fraudulent Mismanagement Independent of Misrepresentation or Nondisclosure Violates Rule 10b–5,* 63 Calif.L.Rev. 563, 570 (1975); Note, *The Controlling Influence Standard in Rule 10b–5 Corporate Management Cases,* 86 Harv.L.Rev. 1007, 1044 (1973); 47 N.Y.U.L.Rev. 1229, 1230 (1972).

**4.** Under state law the only recourse available to the aggrieved shareholders is to initiate an appraisal proceeding, thereby hoping to be awarded the full value of their lost shares. In light of a variety of factors common to state appraisal laws, it is generally agreed that they provide an unrealistic remedy. See generally, Brudney, *A Note on "Going Private,"* 61 Va.L.Rev. 1019, 1023–25 (1975); Brudney & Chirelstein, *Fair Shares in Corporate Mergers and Take Overs,* 88 Harv.L.Rev. 297, 304–07 (1974); Eisenberg, *The Legal Roles of Shareholders and Management in Modern Corporate Decision Making,* 57 Calif.L.Rev. 1, 85 (1969); Manning, *The Shareholder's Appraisal Remedy: An Essay for Frank Coker,* 72 Yale L.J. 223 (1962).

The Delaware statute is typical. The public shareholders are afforded no right to equitable relief under the statute and therefore are totally dependent upon the valuation figure settled upon by the appraiser. *Stauffer v. Standard Brands Inc.,* 41 Del.Ch. 202, 187 A.2d 78 (1962). Yet in determining the value of the "frozen out" shares, the appraiser may not award the public shareholders any gain resulting from the merger itself or the expectation thereof. Under the terms of the statute, any payment must be "exclusive of any element of value arising from the expectation or accomplishment of the merger or consolidation." Del.Code Ann. tit. 8, § 262(b). This measuring criterion has been interpreted very stringently. For example, an appraiser may not award "an aliquot share in the value of the assets of the merged corporation." *Application of Delaware Racing Assoc.,* Del., 213 A.2d 203, 209 (1965). The appraiser's focus must be entirely retrospective: "The determination must be based upon historical earnings rather than on the basis of prospective earnings." *Francis du Pont v. Universal City Studios,* 312 A.2d 344, 348 (Del.Ch.1973).

interpretation of 10b–5 will the public investor gain the redress intended to be made available to him.

Our conclusion that where there has been self-dealing on the part of corporate insiders proof of misrepresentation or non-disclosure is not a *sine qua non* to the establishment of 10b–5 liability is shared by other Circuits. In *Pappas v. Moss*, 393 F.2d 865, 869 (3d Cir. 1968), Judge Seitz held "that where, as here, a board of directors is alleged to have caused their corporation to sell its stock to them and others at a fraudulently low price, a violation of Rule 10b–5 is asserted." The only deception found in the case, two misstatements in the shareholder resolution authorizing the sale, was of no practical consequence to the wrongdoing since shareholder ratification was unnecessary under state law and, in any event, was sought only after the sale was consummated. *Id.* at 867, 869. Similarly, the Fifth Circuit has repeatedly held corporate insiders liable under Rule 10b–5 in the absence of misrepresentation. For example, in *Reckant v. Desser*, 425 F.2d 872, 882 (5th Cir. 1970) (Wisdom, *J.*), the court wrote:

> "We conclude, therefore, that when officers and directors have defrauded a corporation by causing it to issues securities for grossly inadequate consideration to themselves or others in league with them or the one controlling them, the corporation has a federal cause of action under § 10(b) . . . . The essence of the transaction is not significantly different from fraudulent misrepresentation perpetrated by one individual or another."

Similarly, in *Shell v. Hensley*, 430 F.2d 819, 826–27 (5th Cir. 1970) (Ainsworth, *J.*), citing *Schoenbaum*, the court held directors liable for scheming to sell control to another corporation. In response to the argument that there had been no deception of the corporation warranting 10b–5 liability,

---

In short, the controlling shareholders have every incentive to "freeze out" the outsiders since, even if the appraisal procedure functions perfectly, by the terms of the statute the insiders alone capture all of the prospective gains associated with the merger.

In addition, procedurally the Delaware appraisal route is far inferior to a federal cause of action in terms of protection for the minority shareholders. For example, unlike a federal class action Delaware explicitly bars those who actually initiate an appraisal from receiving compensation from non-active members of the class of displaced shareholders, even if the latter have expressed their disagreement with the merger terms and have asked to be included in the final recovery. *Raynor v. LTV Aerospace Co.*, 317 A.2d 43, 46 (Del.Ch.1974); *Levin v. Midland-Ross Co.*, 194 A.2d 853, 854 (Del.Ch. 1963). The Delaware courts acknowledge that this inevitably creates a free-rider problem, see 317 A.2d at 46, which in turn insures that only a minority shareholder with a large bloc of shares will find it beneficial to seek an appraisal in the first instance. As Dun's Review, January 1975, at 64, notes: The proceeding takes years . . . and the investors do not even collect dividends while the appraisal is in the courts. Unless a shareholder has at least 20,-000 shares, most attorneys believe it rarely pays off financially. . . ." Furthermore the statute expressly excludes the costs of attorneys or expert fees from the appraisal recovery. Tit. 8, § 262(h).

Finally, the extent of discovery rights available to displaced investors remains unclear. The statute provides that the appraiser "may" examine any books and records of the corporation in question, § 262(e), but says nothing about the minority shareholders other than to insure them "a reasonable opportunity . . to submit to him pertinent evidence on the value of the shares," § 262(e). In the past, when "frozen out" shareholders have attempted "to complicate the issue raised" by demanding "proceedings of an adversary nature," they have been repudiated. *Lichtman v. Recognition Equipment Inc.*, 295 A.2d 771, 772 (Del.Ch. 1972) (claimant cannot introduce evidence of the value of stock options lost due to the merger). And while the outside shareholders therefore remain heavily dependent upon the corporation for information, Delaware law does not require disclosure of such information to shareholders even after the fact except for notice of the completed merger and a statement of the buy-out price. Tit. 8, § 253(d). As one commentator notes, "[t]he crucial valuation evidence—estimates of future earnings or of salable value of assets—is available to management but rarely to outsiders. Hence, these evidentiary problems which beset an outsider seeking appraisal or challenging for unfairness a merger which was timed by insiders make it a rare case in which he will succeed in establishing a value higher than was offered in the merger, in view of the leeway which courts allow to management's judgment." Brudney, *supra*, at 1024 n. 21.

since the controlling directors had all the relevant information, the court responded that to so construe 10b–5 would be to permit "the basest sort of chicanery" and remove the "protection of the section and the rule merely because of the ease with which defendants victimized [the corporation]." See also *Bryan v. Brock & Blevins Co.*, 490 F.2d 563, 571 (5th Cir.), *cert. denied*, 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974); *Travis v. Anthes Imperial Ltd.*, 473 F.2d 515, 527 (8th Cir. 1973) (Rule 10b–5 liability found even though "[t]he essence of the plaintiffs' complaint . . . is that the defendants violated § 10(b) and Rule 10b–5 by engaging in self dealing . . . . Here, as in *Sup't of Insurance*, the defendants' self dealing was a violation of a fiduciary obligation to minority shareholders . . . .").

Defendants' efforts to reconcile these decisions by searching for some misrepresentation or non-disclosure ignores the court's plain language in each case and exalts form over substance. Such misrepresentations as may be found generally related to technical, trivial matters, having little or no relevance to the manipulative conduct giving rise to 10b–5 liability. Furthermore, in some of the cases the courts, in imposing § 10(b) liability, were quite explicit in acknowledging the absence of misrepresentation or openly minimizing its import to the illegal conduct under challenge.

Thus our decision today is not only consistent with the trend of our own case law on the subject of 10b–5 liability but with the line of authority developing in other Circuits. In holding that a short-form merger which lacks any legitimate corporate purpose may violate 10b–5 we of course do not foreclose use of the device for legitimate corporate purposes. Such a merger, for instance, might lawfully provide an acceptable method of enabling a corporation to achieve substantial savings in operating expenses or to dispose of an unprofitable business at a favorable price. However, where a short-form merger involving use of a dummy corporation appears to be used for no purpose other than to squeeze out minority public shareholders, as is alleged in this case, the burden is upon the corporate insiders to demonstrate the existence of a legitimate compelling corporate purpose.

MOORE, Circuit Judge (dissenting):

I most strongly dissent from the use of their powers by two judges of one of the eleven judicial Circuits to override and nullify not only the corporate laws of Delaware with respect to short-form corporate mergers, but also, in effect, comparable laws in an additional thirty-seven States.[1]

By their opinion, the majority has found a fraudulent scheme, and hence a violation of Rule 10b–5, where none exists. They have established an irrebuttable presumption that use of the short-form merger law amounts to a fraud *per se*. They have added a clause to the Delaware statute—not placed there by the State's legislature—that a short-form merger must have a "justifiable corporate purpose". They have manufactured evil intent and attributed it to individuals who were merely following the lawful edicts of Delaware, to the point of characterizing as "full of cunning and guile", and "so sophisticated as almost to

---

1. The following States have short-form merger statutes (the percentage of the subsidiary's stock which must be owned by the parent appears in parenthesis after each State):

| | |
|---|---|
| Nebraska (80%) | Kansas (90%) |
| * * * | Kentucky (90%) |
| Arkansas (90%) | Louisiana (90%) |
| Colorado (90%) | Maine (90%) |
| Connecticut (90%) | Maryland (90%) |
| Delaware (90%) | Massachusetts (90%) |
| Florida (90%) | Michigan (90%) |
| Georgia (90%) | Nevada (90%) |
| Hawaii (90%) | New Jersey (90%) |
| Iowa (90%) | Ohio (90%) |
| Oregon (90%) | Indiana (95%) |
| Pennsylvania (90%) | Mississippi (95%) |
| Rhode Island (90%) | Montana (95%) |
| Tennessee (90%) | New Mexico (95%) |
| Texas (90%) | New York (95%) |
| Utah (90%) | North Dakota (95%) |
| Virginia (90%) | South Carolina (95%) |
| West Virginia (90%) | Vermont (95%) |
| Wisconsin (90%) | Washington (95%) |
| * * * | * * * |
| Illinois (99%) | |

defy belief", corporate actions of the utmost simplicity and patent reasonableness in today's economy and securities market.

My agreement with the majority starts and stops on the first page of its opinion. The case is "important, [and] interesting"; it is not "complicated". Although legal issues are frequently clothed in dark and light shades of gray, the case at bar is a study in the stark contrast of black and white. The majority's conjury in holding that this case presents a violation of Section 10(b) of the Securities and Exchange Act and Rule 10b–5 promulgated thereunder [2] is totally without factual anchor, and I cannot refrain at the outset from objecting to the frailty of their factual foundation, which is truly of the character of bricks without straw and an omission that warrants immediate correction.

## I. THE FACTS

The facts are not in dispute, and should be stated for the record in their particulars.

The sovereign state of Delaware in its legislative wisdom enacted a statute, which gives to corporations chartered under its laws, the privilege of merging parent and subsidiary under strictly limited circumstances, namely, ownership by the parent of at least 90% (here approximately 95%) of the stock of a subsidiary. Delaware General Corporation Law (DCL) § 253. The statute provides for the payment of cash to the minority stockholders or, in the event that any such stockholder is dissatisfied with the cash offer, he may seek an appraisal in the Delaware Court of Chancery to establish the stock's value. DCL §§ 253(d), 262. In any such proceeding the stockholder would be able to adduce whatever proof he might believe to be supportive of his theory of true value.

The statute, referred to as the "shortform" merger proceeding, contains no provision for advance notice of the merger to

be given to the minority (10% or less); only approval by the parent's directors and stockholders is required. Notice of the merger, however, has to be given within 10 days of its effective date, and within 50 days thereafter (following an initial demand within 20 days on the surviving corporation) appraisal, if desired, must be sought. DCL § 253(d).

Prior to the merger at issue, some 95% of the stock of Kirby Lumber Corporation (Kirby) was owned by Santa Fe Natural Resources, Inc. (Resources) which in turn is wholly-owned by Santa Fe Industries, Inc. (Santa Fe).

Plaintiffs are in the 5% (approximately) minority group of Kirby.

To take advantage of § 253 of the Delaware Corporation Law another Delaware corporation, Forest Products, Inc. (FPI) was organized which acquired from Resources its Kirby stock (95%) and on July 31, 1974 Kirby and FPI were merged.

Some time prior to the merger (February 19, 1974) defendants [3] had obtained from Appraisal Associates a written appraisal of the land (exclusive of minerals), timber, buildings and machinery of Kirby as having a market value of $320,000,000. Such an appraisal of physical assets mathematically would have amounted to a book value of the outstanding shares of Kirby of $722.

Subsequently, defendants, seeking a fair market value appraisal of the Kirby stock as of June 24, 1974 obtained from Morgan Stanley & Co. a stock valuation of $125 per share. This figure was given with knowledge of Appraisal Associates' valuation of Kirby's physical assets of $320,000,000.

After the merger, as provided by Delaware law, DCL § 253(b), namely, "within 10 days after the effective date of the merger", notice of the merger was given to the minority stockholders that they had a right to receive $150 per share in cash or to seek

---

**2.** Section 10(b) prohibits only those manipulative or deceptive devices "in contravention of such rules and regulations as the Commission may prescribe". A condition precedent to a violation of Section 10(b) is therefore the viola-

tion of the appropriate SEC rule, namely, 10b–5. *See* n. 4, *infra*.

**3.** Defendants, unless otherwise specified, will refer to the Santa Fe defendants, excluding Morgan Stanley & Co.

an appraisal of the value of their shares as provided by Delaware law. DCL § 253(d).

Accompanying the notice was a statement (some 57 pages of the Appendix) which, in addition to setting forth extensive financial data, included: (1) the Morgan Stanley stock value based largely upon the price ranges for the Kirby stock freely traded on the market; (2) the Appraisal Associates' appraisal of physical assets of $320,-000,000; and (3) an appraisal by Riggs and Associates of Kirby's oil, gas and mineral property interests.

On August 21, 1974 plaintiffs elected to pursue the Delaware law remedy of demanding an appraisal. Thereafter, they changed their minds and on September 9, 1974 withdrew this demand. The next day they filed their complaint in the federal court seeking to bring their claim within Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C § 78j(b)) and Rule 10b–5, 17 C.F.R. 240, 10b–5. Their original complaint was based primarily on the claim that defendants sought to acquire the minority's stock at a "grossly undervalued price" which constituted in plaintiffs' opinion a "manipulative and deceptive device" amounting to a violation of Rule 10b–5 and "a breach of fiduciary obligation owed to Kirby and its minority stockholders." (Compl. par. 9) An amended complaint added a claim of diversity jurisdiction over the defendants.

At this point it is essential to underscore what was *not* involved in the merger. There was no failure to comply with state law. There was no failure to disclose by the defendants. On the contrary, all of plaintiffs' assertions of stock value derived from the report circulated by the defendants to the minority shareholders. Similarly, there was no misrepresentation of fact or law made to the minority.

## II. FEDERAL LAW

The purpose of § 10(b) of the Act, and Rule 10b–5 promulgated thereunder, is the elimination of fraudulent practices in the securities industry. These are anti-fraud provisions and the existence of fraud is the key to their application.[4]

It states the obvious to say that the essence of fraud is deliberate deception or concealment which is calculated to deprive the victim of some right or to obtain, by deceptive means, an impermissible advantage over him.[5] It was to eliminate such deception and concealment that the federal securities laws imposed a duty to disclose on those with inside information. Similarly, it has been to eliminate deception and concealment, *i. e.,* to eliminate *fraud,* that the courts have stringently enforced this duty, imposing liability whenever a defendant fails to disclose his actions, his position, or his knowledge.

The majority cites numerous cases en route to its holding that failure to disclose is no longer a prerequisite for liability under Rule 10b–5—that, in fact, liability under the anti-fraud provisions of 10b–5 will attach in the *complete absence* of any deception or misrepresentation, in short, in the complete absence of fraud altogether. This is an untenable hypothesis, and one which is totally disproved by even a cursory review of the decisions in the area. I pro-

---

**4.** Rule 10b–5, which gives exclusive effect to Section 10(b), is entitled *"Employment of manipulative and deceptive devices"*, and declares it to be unlawful for any person,

"(a) to employ any *device, scheme, or artifice to defraud,*

(b) to *make any untrue statement* of a material fact or to *omit to state a material fact* necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) to engage in any *act, practice, or course of business which operates or would operate as a fraud or deceit* upon any person,

in connection with the purchase or sale of any security." (emphasis added)
Subsection (b) is inapplicable here because no claim is made that there were any untrue statements or omissions in the vast amount of information given to the minority stockholders. Plaintiffs' claims must, therefore, rest upon defendants' use of the Delaware statute as a "device * * * to defraud" (subsection (a)) or an "act * * * which [operated] as a fraud or deceit * * *."

**5.** *See, e. g., Black's Law Dictionary* (4th Ed. 1951) at 788–789; *Ballentine's Law Dictionary* (3d Ed. 1969) at 496–497.

pose to review the leading cases in order to dispel at once any rumors that 10b–5 no longer concerns itself with fraud, but instead extends to every corporate transaction viewed with displeasure by the courts.

In 1964 in *Ruckle v. Roto Amer. Corp.,* 339 F.2d 24 (2d Cir. 1964), the directors of the corporation approved the issuance of stock to its president for an inadequate consideration. It was alleged that information material to the exercise of informed judgment had been withheld from the directors—a clear instance of fraud.

The same year this Court decided *O'Neill v. Maytag,* 339 F.2d 764 (2d Cir. 1964), in which we said: "There can be no serious claim of deceit, withheld information or misstatement of material fact in this case"; the opinion went on to say that, where a complaint alleges a breach of the general fiduciary duty existing among corporate officers, directors and shareholders, "no cause of action is stated under Rule 10b–5 unless there is an allegation of facts amounting to deception." 339 F.2d at 767, 768.

*SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1964), is cited by the majority but in fact is more supportive of the dissent. *Capital Gains,* it should be noted at the outset, was not a 10b–5 case; it involved the unique duties and responsibility of investment advisors to their clients. The entire case was concerned with non-disclosure—specifically, with the failure of the defendant-investment advisor to apprise his clients of his self-interest in their transactions. The defendant's practice had been to buy a stock shortly before recommending it in a newsletter to his clients, and thereafter to sell it (usually within two weeks of the dissemination of the newsletter). The Supreme Court interpreted his legal and equitable duty *not* as a duty to refrain from trading himself (an act not prohibited by state law) but as a duty to disclose whatever interest he in fact had. It was not the existence of

self-interest or of the defendant's action in furtherance thereof which went afoul of federal securities law; it was his *concealment* of those facts.

Three years later this Court decided *Vine v. Beneficial Finance Co.,* 374 F.2d 627 (2d Cir.), *cert. denied,* 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). Implicitly acknowledging the validity of short-form mergers,[6] the Court struck down a fraudulent sale of certain stock shares at an inflated price on the ground that the scheme presented "a classic case of deception". 374 F.2d at 635. Ruling on the applicability of the federal securities laws to corporate mergers, the Court held:

> "What must be shown is that there was *deception* which misled the Class A stockholders . . . ." 374 F.2d at 635. (emphasis supplied)

In 1968 came *Schoenbaum v. Firstbrook,* 405 F.2d 215 (2d Cir. 1968), a case much relied upon by appellants, heard by an *en banc* Court. This case in many respects was a counterpart of *SEC v. Texas Gulf Sulphur,* 401 F.2d 833 (2d Cir. 1968) (*en banc*). In *Schoenbaum,* Aquitaine, which controlled Banff Oil, had knowledge of an important oil discovery by Banff. Without disclosing this fact, Aquitaine caused Banff to issue to it 500,000 shares of Banff at $1.35 a share. After the public announcement of the discovery, Banff stock sold as high as $18 a share. There was more than sufficient indicia of fraudulent non-disclosure to justify denial of a summary judgment motion.

In 1971 the Supreme Court decided *Supt. of Insurance v. Bankers Life and Cas. Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), on appeal from this Circuit. The fraud there was most flagrant. One Begole and a group agreed to buy for themselves all of Manhattan Casualty Company's stock from Bankers Life for $5,000,000 and conspired with others to pay for the stock, not with their own funds but, once they had

---

6. "Thus, once the conditions for a short-form merger had been achieved, appellant's rights in his stock were frozen. *He had and still has only the options of exchanging his stock* for $3.29 a share, pursuant to appellee's offer, *or pursuing his right of appraisal,* which would also result in cash from appellee." 374 F.2d at 634. (emphasis supplied)

obtained the stock, out of Manhattan's own assets. A more fraudulent scheme would be difficult to imagine.

In 1972 came both *Drachman v. Harvey,* 453 F.2d 722 (2d Cir. 1972) (*en banc*) and *Popkin v. Bishop,* 464 F.2d 714 (2d Cir. 1972). The Court in *Drachman* found that as the result of a conspiracy, whereby the Harveys had sold their controlling interest in Harvey Aluminum to Martin Marietta at handsome premium for themselves and they had caused Harvey Aluminum to redeem its convertible bonds to preserve Martin Marietta's stock control of Harvey Aluminum, there was fraud within the scope of § 10(b) and Rule 10b–5.

*Popkin* presented a somewhat different situation. It was largely to enjoin a merger on the ground that the exchange ratio of the respective stocks was unfair. This Court reviewed the many cases in this field, noting that "Emphasis on improper self-dealing did not eliminate non-disclosure as a key issue in Rule 10b–5 cases", 464 F.2d at 719, and concluding that "when there has been such disclosure of a merger's terms, it seems unwise to invoke federal injunctive power, particularly since doing so might well encourage resort to the federal courts by any shareholder dissatisfied with a corporate merger". *Id.* at 720. But, even assuming the federal courts are anxious to reach out for this sort of business, to do so at the cost of nullifying the corporate laws of many states respecting mergers of comparatively fractional amounts of outstanding stock should cause some restraint in enacting such judicial legislation.

Other circuits have found conspiracy and deception as basic in bringing cases within the statute and Rule. *See Dasho v. Susquehanna Corporation,* 380 F.2d 262 (7th Cir. 1967) and *Shell v. Hensley,* 430 F.2d 819 (5th Cir. 1970). And of particular interest because it was decided in a federal court in Delaware is *Voege v. American Sumatra Tobacco Corporation,* 241 F.Supp. 369 (U.S. D.C., Delaware, 1965). It, too, was a "merger" case. On the merger, $17 a share was offered; the plaintiff refused the offer and demanded an appraisal but, in so doing, did not know that as part of the merger it was planned to sell off a part of *Sumatra's* physical assets (land) which would alone bring in more than $17 a share. The Court, noting that the defendants—for purposes of their motion to dismiss—conceded that their misleading statements amounted to a scheme to defraud under Rule 10b–5, held that the plaintiff could be regarded as a "seller" within the meaning of the Rule. Appraisal was held to be an insufficient remedy because of plaintiff's ignorance of the fraud at the time she demanded the appraisal. 241 F.Supp. at 375.

The District Court in this Circuit recently considered the permissibility of corporate mergers for purposes of enforcing federal securities law. In *Levine v. Biddle Sawyer,* 383 F.Supp. 618 (S.D.N.Y.1974), which involved a short-form merger, the Court denied defendant's motion for judgment on the pleadings on the ground that the facts presented a "scheme of deceit and concealment". 383 F.Supp. at 622.

Still more recently, in *Kaufman v. Lawrence,* 386 F.Supp. 12 (S.D.N.Y.1974), *aff'd per curiam,* 514 F.2d 283 (1975), the District Court refused to grant a preliminary injunction to halt a long-form corporate merger on the grounds that material omission had not been shown, and that the case was not one involving "any hidden or secret action by an outside group to take over control of the company". 386 F.Supp. at 17. The Court concluded pertinently:

> While Sections 10(b) and 14(e) must be read flexibly, and not technically or restrictively, * * * there is nothing invalid *per se* in a corporate effort to free itself from federal regulations, provided the means and the methods used to effectuate that objective are allowable under the law. Nor has the federal securities law placed profit-making or shrewd business tactics designed to benefit insiders, without more, beyond the pale. Those laws in respect of their design and interpretive reach, as I understand them, include the provisions relied on here, and are satisfied if a full and fair disclosure is made, so that the decision of the holders

of WRG stock to accept or refuse the exchange offer can be said to have been freely based upon adequate information.

A public company going "private" may indeed raise serious questions concerning protection of the public interest. There is, however, no foundation on the record before me from which the ramifications of that interest within the reach of the federal securities laws might conceivably be explored. . . . *Ibid.* (citations omitted)

Non-disclosure for purposes of deliberate concealment or misrepresentation is the essence of fraud, and synonymous with liability under Section 10(b) and Rule 10b–5. Against this setting the facts at bar are startling for the picture of unquestionable non-liability under Rule 10b–5 which they present. To reiterate, the defendants—pursuant to a duly enacted state law—effected a merger of a parent corporation and its 95%-owned subsidiary. This transaction is expressly sanctioned by statute, and all statutory requirements were complied with. Complete disclosure regarding valuation of shares was made. There was no attempt to hide the merger, or to misrepresent the minority's right to object and demand appraisal. On the contrary, the minority were expressly informed of their right to do so.

To conclude that this series of events presents a scenario of fraud is a patent distortion of that term. This case presents no claim of fraud at all, and appending the label of "fraud" to plaintiffs' complaint or the majority's opinion does not change the fact one iota. The facts adduced here are wholly unrelated to any cause of action under Section 10 and Rule 10b–5, and legal legerdemain cannot render them otherwise.

## III. STATE LAW

The majority concedes that when it speaks of fraud, it does not mean "fraud" at all, but rather a breach of fiduciary duty. Majority opinion at 1291, 1296. Under the law, breach of fiduciary duty and commission of fraud are wholly different from one another, as was recognized by this Court in *O'Neill v. Maytag, supra,* at 339 F.2d 767:

While the essence of these [fiduciary] duties in some circumstances is honest disclosure, the allegations in the instant case are typical of situations in which deception may be immaterial to a breach of duties imposed under common law principles.

The majority's insistence on extending federal securities anti-fraud provisions beyond the bounds of fraud and into the realms of fiduciary duty is disturbing enough. Accompanied, as it is, by their erroneous finding of a breach of such duty, and by the astonishing and impermissible establishment of a federal common law of corporations—as ill-founded as it is improper—disconcertion must give way to alarm.

There is no question that it is within the proper power of the State to enact statutes regulating corporation mergers. Corporations are creatures of the State. They are created under State law; they are empowered by State statute; and they are regulated by the legislative mandates of the State which has sanctioned their existence. Every State in the Union has comprehensive general business or corporation codes which attest to the exercise of the States' proper responsibilities over the formation of corporate entities and the regulation of corporate activities.

Exercising its unquestionable right to determine the statutory rights and duties of parent and subsidiary corporations chartered under its laws, Delaware has permitted subsidiaries to dispense with what would be the mere formality of a shareholder vote on merger in those circumstances in which the parent already owns an overwhelming majority of the subsidiary's shares. Delaware law does *not* require that the merger be pursuant to any corporate purpose more limited than the general corporate purposes contained in the corporate charter, which set the boundaries beyond which the corporation will be said to act *ultra vires.* The short-form merger statute is not a procedure designed to effect certain business outcomes; it is the articulation of certain substantive rights which are given to majority and minority shareholders in

the State of Delaware[7]—respecting the parent corporation, a right to expedite a merger which is already assured by the parent's overwhelming majority ownership of the subsidiary; respecting the minority, a protective "right to object and demand appraisal". *Coyne v. Park & Tilford Distillers Corp.*, 38 Del.Ch. 514, 520, 154 A.2d 893, 896 (Del.1959).

The majority misses the point entirely when it comments, as the justification for sidestepping Delaware law, that "Where Rule 10b–5 properly extends it will be applied regardless of any cause of action that may exist under state law" (citing *Vine v. Beneficial Finance Co. supra*). Majority opinion at 1286. "Cause of action" means "judicial remedy," not statutory right or compliance with state law, and the *Vine* Court stated the rule correctly when it held that

> [W]e do not regard the existence of a *state* remedy as negating the federal right. *Vine v. Beneficial Finance Co.*, 374 F.2d at 635–6 (emphasis supplied)

The substantive rights created by § 253 have been explicitly upheld as a valid regulation of Delaware corporations. The Delaware courts have also explicitly rejected the notion that the exercise of rights accorded by § 253 is itself a breach of duty or a perpetration of fraud. Focusing on the plaintiff's charges of fraud in connection with the statutory merger under § 253, the Supreme Court of Delaware ruled, in the leading case on the subject:

> The complaint, of course, contains allegations of oppressive treatment of the minority by the parent corporation, and a prayer that the merger be set aside. But it is plain that the real relief sought is the recovery of the monetary value of plaintiff's shares—relief for which the statutory appraisal provisions provided an adequate remedy. The Vice Chancellor held that in the circumstances of this case that

remedy was exclusive. His analysis . . . was thorough and well-considered, and we agree with it. . . .

[It is argued that] the appraisal remedy under our statutes should not be held to be exclusive.

The answer to this is that the exception above quoted refers generally to all mergers, and is nothing but a reaffirmation of the ever-present power of equity to deal with illegality or fraud. But *it has no bearing here. No illegality or overreaching is shown. The dispute reduces to nothing but a difference of opinion as to value.* Indeed it is difficult to imagine a case under the short merger statute in which there could be such actual fraud as would entitle the minority to set aside the merger. . . . *This power of the parent corporation to eliminate the minority is a complete answer to plaintiff's charge of a breach of trust against the directors of the [merged subsidiary]. . . . Stauffer v. Standard Brands, Inc.*, 41 Del.Ch. 7, 187 A.2d 78, 80 (1962).[8] (emphasis supplied)

This holding accords with the Delaware common law respecting the equitable duty of fiduciaries which, like the statutory law of corporations, lies within the province of the States. Under Delaware law, it is not a *per se* breach of the duty owed the *cestui* for the fiduciary to deal in trust property; in other words, self-dealing is not, by definition, a prohibited activity. Where, for example, the fiduciary has certain already-existing rights to acquire the property of the *cestui*, and where those rights are exercised openly and without deception, no violation of the trust results and a court of equity will not enjoin the acquisition.[9] On the contrary, where legal rights attend the parties to a fiduciary relationship, a court of equity will enforce those rights and will not permit a plaintiff to eschew legal rights and duties under the guise of invoking the

---

7. This was the Court's express holding in *Coyne v. Park & Tilford Distillers Corp.*, 38 Del.Ch. 514, 154 A.2d 893 (Del.1959).

8. *See also, Carl Marks & Co. v. Universal City Studios, Inc.*, 233 A.2d 63 (Del.1967).

9. *See, e. g., In re Thomas*, 311 A.2d 112, 114 (Del.1973); *Equitable Trust v. Gallagher*, 34 Del.Ch. 249, 102 A.2d 538, 545 (1954).

court's equitable jurisdiction.[10] This is, of course, only an expression of the historic maxim and controlling principle that "Equity follows the law".[11]

To place the plaintiffs' allegations in this case into sharp focus, I would turn for a moment to plaintiffs' complaint. Emerging from plaintiffs' extravagant characterization of defendants' conduct as an "unconscionable self-deal" (3) a "FLAGRANT SELF–DEAL WHICH OPERATED AS A FRAUDULENT DEVICE", "a fraudulent overreaching" (16), an "unconscionable taking without compensation" (19) and a "secret squeeze-out" (31),[12] plaintiffs' claims stand out in bold relief: (1) the merger was "Without any notice or disclosure whatsoever to the minority stockholders of Kirby" (Br. p. 4) and (2) the price of $150 offered was grossly below the $772 value of each share based on plaintiffs' theory of dividing the physical assets proportionately among the stockholders. It is on these grounds that the plaintiffs seek equitable intervention by the courts to effect a rescission of the merger.

As must be plain by this point, neither of plaintiffs' two claims warrants such relief. With respect to prior notice, plaintiffs were entitled to none by law—a not unreasonable provision in light of the fact that, under § 253, the 10% minority shareholder is entitled to fair value of his shares, and *not* to any opportunity to thwart the will of the overwhelming majority.[13] The parent corporation breached no fiduciary duty by exercising its statutory option to acquire the subsidiary without notice. The minority shareholders had no right to prevent such acquisition, or to challenge its legality on statutory grounds. Moreover, the minority shareholders had no right to demand from an equity court an affirmative right to notice in abrogation of the legal rights of the parent corporation created by statute and recognized at common law and equity by the Delaware Courts.

With respect to the alleged undervaluation of plaintiffs' shares, Delaware law gives the dissenting shareholder a right to object, and affords him the legal remedy of appraisal. This is held to be both adequate and exclusive under § 253;[14] equitable relief absent fraudulent deception or concealment, is unavailable.[15] It is important to stress that the discrepancy in claimed value of the Kirby stock does not *ipso facto* bespeak fraud. Although they refer to going-concern value (but without supporting proof), plaintiffs' asserted value appears to be based on the assumption that the Kirby physical assets could be liquidated at the appraisal price and the proceeds divided up amongst the stockholders. However, there is nothing in the record to indicate that Kirby had any intention to liquidate and go out of business or that plaintiffs as holders of 143 shares had any power to compel liquidation. Moreover, under Delaware law a dissenting shareholder cannot recover in appraisal proceedings the "liquidation value" of his shares (*i. e.*, a sum equal to his aliquot share in the value of corporate assets); he is entitled only to "the intrinsic value of [his] shares determined on a *going concern* basis". *Application of Delaware Racing Ass'n,* 213 A.2d 203, 209 (Del.1965). (emphasis supplied)

10. *See, In re Markel,* 254 A.2d 236 (Del.1969); *Richard Paul, Inc. v. Union Improvement Co.,* 33 Del.Ch. 113, 91 A.2d 49 (1952); *Wise v. Delaware Steeplechase & Race Ass'n.,* 28 Del.Ch. 532, 45 A.2d 547 (1945).

11. *See, generally,* 27 Am.Jur.2d Equity §§ 118, 124; 30 C.J.S. Equity § 103; 13 Atlantic Rptr. Digest, Equity § 62; 30 A.L.R.2d 925; 9 A.L. R.2d 295.

12. It should be noted that all of these taken together are insufficient *as a matter of law* to satisfy the pleading requirements of F.R.C.P.

9(b) which mandates that allegations of fraud be supported by factual particulars.

13. *See,* Borden, "Going Private—Old Tort, New Tort, or No Tort?", 49 N.Y.U.L.R. 987 (Dec. 1974) (hereinafter "Borden") at 1031, n. 194, for an illuminating evaluation of minority shareholders' prerogative to overrule the majority's will in connection with corporate mergers.

14. *Stauffer v. Standard Brands Inc., supra,* at 187 A.2d 80.

15. *Ibid.*

By their complaint plaintiffs have utterly failed to assert any cognizable breach of fiduciary duty; any injury entitling them to equitable relief; any fact whatsoever indicating impermissible overreaching or deception by the defendants. There has been total compliance with state law, complete disclosure of valuation data, and total availability to plaintiffs of Delaware's appraisal procedures. Significantly, all of plaintiffs' assertions of stock value derive from the report circulated by the defendants to the minority shareholders.

## IV. THE MAJORITY'S HOLDING

Notwithstanding all of the above, the majority has purported to find a violation of law that warrants equitable intercession. The majority's theory is that there was a breach of fiduciary duty to the minority because the merger did not have a "justifiable corporate purpose". This purported fiduciary standard is completely untenable; further comment on it will be made *infra*. First and foremost, however, the point must be made that, in taking cognizance of plaintiffs' claim, the majority has not provided a remedy to correct a fraud; rather it has extended to these plaintiffs an independent, substantive right totally unrelated to the anti-fraud scheme of the federal securities laws and in complete derogation of a valid state rule regulating corporate activity.[16]

Indeed, the majority appears to have ignored the Supreme Court's decision in *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1939), which put an end to federal common law and forbade the federal courts from formulating their own "better rule." [17]

Reaching back to *Swift v. Tyson*, 16 Pet. 1, 10 L.Ed. 865 (1842), the majority has obviously rejected the valid state standards of Delaware defining fiduciary duty, and the valid state laws regulating the powers of state-created corporate bodies. The majority has tossed these off as so much *obiter dicta* and independently pursued a "better rule", altering the rights of parent corporations and minority shareholders in order to suit the majority's pleasure. The majority's use of the term "fraud" is no more than a smokescreen; there is no factual foundation presented by the plaintiffs which indicates any fraud in this case. Moreover, under Delaware law, the short-form merger statute is part and parcel of the charter of every Delaware corporation, and of the contract between every such corporation and each of its shareholders.[18] The majority thus is redrafting corporate charters and private contracts at the same time as it is putting a torch to the teachings of *Erie*. In effect, the majority has decided that equity will not follow the law, it will rewrite it.

16. When it is remembered that some three-quarters of the States have statutes similar to the Delaware short-form merger law, the magnitude of the majority's holding may be readily appreciated. *See* n. 1, *supra*.

17. The Third Circuit, specifically referring to the law governing fiduciary duty, said as much in the well-known diversity suit of *Zahn v. Transamerica Corp.*, 162 F.2d 36, 42 (3d Cir. 1947):

> "In our opinion . . . the law of Kentucky imposes upon the directors of a corporation or upon those who are in charge of its affairs . . . *the same fiduciary relationship* in respect to the corporation and to its stockholders *as is imposed generally by the laws of Kentucky's sister States or which was imposed by federal law prior to Erie R. Co. v. Tompkins.*" (citation omitted; emphasis supplied)

*See, also, O'Neill v. Maytag*, 339 F.2d 764, 767 (2d Cir. 1964), wherein we held that:

> "Between principal and agent and among corporate officers, directors and shareholders, *state law has created duties which exist independently of the sale of stock.* While the essence of these duties in some circumstances is honest disclosure, *the allegations in the instant case are typical of situations in which deception [under Rule 10b–5] may be immaterial to a breach of duties imposed under common law principles.*" (emphasis supplied)

That the federal courts' rules, in fact, may not necessarily be "better" is exemplified by the federal test for fiduciary duty adopted by the majority here. *See* this dissent, *infra* at pp. 1307–1309.

18. *Voege v. American Sumatra Tobacco Corp.*, 241 F.Supp. 369 (D.Del.1965); *Greene v. Schenley Industries*, 281 A.2d 30, 35, 36 (Del. Ct.Ch.1971).

**1308**

Their choice for a federal fiduciary standard respecting corporations is the best possible indication of the error of the majority's holding. "Justifiable corporate purpose", as it is used in the majority opinion, is a totally amorphous standard which, although it is nowhere defined in the majority opinion, is nevertheless so inapposite as applied to short-form mergers that it cannot withstand even superficial scrutiny.

The short-form merger procedure permits a corporation to retreat from the public marketplace of securities trading and assume the status of a private company. "Going private", as the process has been popularly labeled, is being more and more frequently resorted to in today's recession economy. The benefits to a corporation are varied. Freedom from worry about the impact of corporate decisions on stock prices; ability to take greater business risks than those sanctioned by federal securities agencies; a switch to more conservative accounting, resulting in lower taxes; the savings which result from no longer having to prepare, print and issue the myriad of documents required under federal and state disclosure laws; the removal of a pressure to pay dividends at the expense of long-term capital development or speculative capital investment—these are some of the advantages which may enure to a corporation "going private".[19] It is essential to underscore that *all* of the above-stated advantages accrue from the *very act of eliminating the 10% shareholders who confer public status on the corporation.* To say that such action is not a "valid business reason" (plaintiffs' complaint) or a "justifiable corporate purpose" (the majority holding) is to completely misapprehend the impact of the shift in status from publicly held corporation to private company. Benefit to the parent company is not incompatible with the notion of "justifiable corporate purpose"; it is a legitimate part of it. As one commentator has noted:

The selfish motivation is often adverted to in connection with going private, but one wonders why that should be. Are only those corporate transactions to be favored which are not motivated by greed? Must we seek to do public good in order to avoid regulatory sanctions? The questions answer themselves. To observe that greed is a compelling motivation is merely to observe that we live in a free-enterprise society.[20]

It should be obvious that minority shareholders are as similarly motivated as the majority owners, and that their concern is not the purported damage to the public of "going private" transactions—the likelihood of which I seriously doubt—but rather, the equally selfish desire to avoid taking a loss while "playing the market". Such a desire, I submit, is a wholly inadequate justification for according to the 10% a veto power over the will of the 90%. Even our political system does not require 100% consensus before the majority will may be implemented; in fact, such a thought would be completely inimical to the values inherent in our democratic philosophy.

It should be recognized that, in a transaction such as the short-form merger at issue here, the parent corporation does not acquire any practical power or control over corporate management that it did not already have as a 90% owner. To the degree that the majority condemns "self-aggrandizement" as an effort to acquire control for self-benefit, then the merger *per se* results in no increased aggrandizement at all:

If the evil in going private is perfecting or ensuring control, it would follow that there would be no wrong when the proponents of the transaction already have an impregnable hold on control. . . .[21]

Whatever "justifiable corporate purpose" may mean, it should be obvious from the above that, as utilized by the majority, it is a completely irrational concept that bears no reasonable relationship to the realities of

19. For an excellent discussion of the phenomenon and its impetus, *see* Borden at 1006–1018.

20. Borden, at 1013 (footnote omitted).

21. *Ibid.* at 1031, n. 194.

 

short-form mergers in the actual business world.

I cannot believe that the majority has chosen to exceed the bounds of its jurisdiction under federal law in order to espouse so frail a concept, and I am more convinced than ever of the wisdom which the Supreme Court showed in compelling the federal judiciary to refrain from the business of rewriting state law by judicial fiat.

## V. THE CONCURRENCE

Judge Mansfield in his concurring opinion falls into the same error as is so obvious in the majority opinion, namely, that "a short-form merger consummated without any legitimate purpose and without any advance notice to the minority public stockholders, resulting in harm to the latter, violates Rule 10b–5." In short, any use of the Delaware statute is fraud *per se,* tantamount to a "device, scheme or artifice to defraud" and a course of business conduct that operates "as a fraud or deceit".

Particularly disturbing is the unfounded hypothesis that the merger was intended to take improper advantage of market conditions by the deliberate tender to plaintiffs of a grossly inadequate price for their shares. Plaintiffs themselves do not go so far by way of allegation.

Judge Mansfield in footnote 4 argues the inadequacy of an appraisal proceeding in fixing a fair market price and straightaway concludes that a federal court "would be required to determine a fair buy-out price" —the very determination which the Delaware law provides. On such a hearing the same items of proof would undoubtedly be offered: purchases and sales of Kirby stock by willing purchasers and sellers on or off public trading markets over a period of time; annual earnings per share in years good and bad; price/earnings ratios; projected earnings; and the physical asset value, as appraised, of $320,000,000.[22] The trial would have become a battle of experts, financial, accounting and physical property

appraisers, but with the judicial system of Delaware available for this purpose it would not have lacked due process. Where there are disputes between parties as to fair values the courts not infrequently become the final arbiters, but the courts of the Second Circuit should not appropriate unto themselves the exclusive right and competence to engage in such determinations.

In summary, in my opinion, both majority and concurring opinions depart widely from the Congressional purpose in enacting Section 10(b), from our own decisions thereunder and from the Supreme Court's interpretation thereof—thus far.

I would affirm the District Court's dismissal of plaintiffs' complaint.

---

**22.** Public financial information makes available the fact that many stocks publicly traded sell at prices only a fraction of their book value, whereas others sell at prices far in excess thereof.